**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

James Pierre Williams,
Petitioner
-vs-
Unknown Sterns, et al.,
Respondents.

CV-14-1417-PHX-DLR (JFM)

**Report & Recommendation**
**on Petition for Writ of Habeas Corpus**

## I. MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Kingman, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on June 24, 2014 (Doc. 1).  On January 6, 2015 Respondents filed their Limited Response (Doc. 11).   Petitioner filed a Reply on February 2, 2015 (Doc.  12).

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II. RELEVANT FACTUAL & PROCEDURAL BACKGROUND

### A. FACTUAL BACKGROUND

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals summarized the factual background as follows:

> During Williams' employment as a nurse at St. Luke's in 2006, a patient ("C.C.") accused him of inappropriate sexual contact. The allegations were investigated and DNA samples taken, but the case was not prosecuted at the time. In 2008, a patient at Paradise Valley Hospital ("S.F.") accused Williams of inappropriate

1

sexual contact. An investigation ensued, and Williams was arrested in January 2009.

   Joshua Deason was Williams' cellmate for approximately six weeks. Deason was released from jail on March 1, 2009. On March 5, 2009, Williams called a friend, John Swan, giving him contact information for Deason and instructing Swan to call him. Williams explained that Deason was supposed to get "some paperwork done for [him]." Williams told Swan to tell Deason there was money in it for him. In a conversation with his wife on March 11, 2009, Williams stated he would not be coming home "unless one of my witnesses drop[s] dead."

   During the early morning hours of March 19, 2009, someone threw a Molotov cocktail through S. F. ' s bedroom window while she slept. S.F. was able to extinguish the fire and exit her apartment, along with her mother.

   Following the arson, Swan spoke to Williams in code, reporting that a cocktail had been thrown through S.F.'s window, and that Deason would leave S. F. in the desert if necessary. Williams replied that Deason "didn't even do what he said he was going to do." Williams persuaded Swan to call S. F. and make up a "cockamamie" excuse to gain information. After Swan spoke with S. F., Williams instructed him to let Deason know, "I just spoke to [our] girl…stop bullshitting and do what he say."

   The fire investigator reviewed Williams' recorded jail conversations. Meanwhile, the detective investigating the sexual assaults contacted Deason's daughter and retrieved a piece of paper the daughter found in Deason's wallet that listed a physical description of S.F. and her address. This information was written on the back of Williams' change of counsel form.

   In May 2009, Williams was indicted on four counts of sexual assault, each a class two felony (counts 1 and 2 involved C. C.; counts 3 and 4 involved S. F.); one count of attempted first degree murder, a class two dangerous felony (count 5); one count of conspiracy to commit first degree murder, a class one dangerous felony (count 6); one count of aggravated assault, a class three dangerous felony (count 7) ; one count of endangerment, a class six dangerous felony (count B); one count of arson of an occupied structure, a class two dangerous felony (count 9); and one count of use of wire communication or electronic communication to facilitate an offense, a class four felony (count 10).

(Exhibit Y, Mem. Dec. at 2-4.)  (Exhibits to the Answer, Doc. 11, and the Supplement, Doc. 14, are referenced herein as "Exhibit ___.")

## B. PROCEEDINGS AT TRIAL

   Petitioner proceeded to a jury trial.   The State filed Motion in Limine (Exhibit HH), seeking to preclude evidence of the state's initial decision to not prosecute on the allegations of C.C..   The motion was granted without opposition.  (Exhibit II, M.E. 5/18/10.)

Petitioner was found guilty on the charges of aggravated assault and arson, but acquitted of the remaining charges.  He was sentenced to presumptive terms of 7.5 years on the aggravated assault and 10.5 years on the arson.  (Exhibit V, R.T. 12/15/10 at 25, *et seq.*)

## C.  PROCEEDINGS ON ORIGINAL DIRECT APPEAL

On or about January 11, 2011, Petitioner filed a delinquent notice of appeal.  The Arizona Court of Appeals dismissed the appeal as untimely.  (*See* Exhibit FF, Second PCR Pet. at 2.)

## D.  PROCEEDINGS ON POST-CONVICTION RELIEF

**First PCR Proceeding** - On March 18, 2011, Petitioner filed a Notice of Post-Conviction Relief (Exhibit BB).  On August 1, 2011, Petitioner filed a *pro per* Petition for Post-Conviction Relief (Exhibit CC).  The State moved (Exhibit DD) to dismiss without prejudice based upon a lack of certification pursuant to Ariz. R. Crim. P. 32.5.[1] Based upon the lack of a certification, the proceeding was dismissed on August 26, 2011. (Exhibit EE, M.E. 8/26/11.)

**Petition for Special Action** – Sometime prior to May 1, 2012, Petitioner filed a Petition for Special Action with the Arizona Court of Appeals, naming the trial judge as respondent.  According to Petitioner, this petition raised his jurisdictional claims asserted in Ground Three. (Reply, Doc. 12 at 3.)  On May 1, 2012, the Arizona Court of Appeals summarily declined to accept jurisdiction.  (Reply, Doc. 12, Exhibit E, Order 5/1/12.)

**Second PCR Proceeding** – On May 10, 2012, Petitioner filed, through counsel, his second PCR Petition (Exhibit FF), seeking leave to file a delayed notice of appeal,

---

[1]  The State argued that Rule 32.5 required "a defendant who files a petition for postconviction relief to include in the petition 'every ground known to him or her for vacating, reducing, correcting or otherwise changing all judgments or sentences imposed upon him or her, and certify that he or she has done so." (Exhibit DD, Mot Dismiss at 1-2.)  Rule 32.5 was amended in 2013 to remove that requirement.  *See* Ariz. Sup. Ct. Order No. R-13-009, available at *http://www.azcourts.gov/Portals/20/2013%20Rules %20Nov/R130009.pdf*, last accessed 8/14/5.

asserting that Petitioner had been refused access to resources to file such a notice until January 10, 2011, resulting in dismissal of the appeal as untimely.  Without objection by the State, the Petition was granted, and Petitioner was granted leave to file a delayed notice of appeal.  (Exhibit GG, M.E. 5/22/12.)

**E.  PROCEEDINGS ON DELAYED DIRECT APPEAL**

Petitioner then filed his delayed direct appeal.  Counsel filed an Opening Brief (Exhibit W) pursuant to *Anders v. California*, 386 U.S. 738 (1969) and related state authorities, asserting an inability to find an issue to appeal.  Petitioner then filed a *pro per* Opening Brief (Exhibit X), arguing: (1) prosecutorial misconduct in opening and closing statements; (2) an insufficient indictment; (3) improper amendment of the indictment; (4) lost jurisdiction as a result of the amendment; (5) lack of jurisdiction based on failure of the trial judge to take his oath of office; and (6) errors in the jury instructions.

On September 5, 2013, the Arizona Court of Appeals issued its Memorandum Decision (Exhibit Y), asserting a review of the "entire record" and an inability to find "fundamental error."  The court found any misstatements in the opening statements were rendered harmless, and their harmlessness was demonstrated by the acquittals, and the other claims of misconduct were baseless or harmless. Challenges to the indictment were waived by failure raise them, and rendered moot by the acquittal on the charge, and did not affect the guilty verdicts.  The allegations regarding the judges' oath were deemed unsupported, and under Arizona's *de facto* officer doctrine, waived by failure to challenge them earlier.  Petitioner's convictions and sentences were affirmed.

Petitioner then filed a Petition for Review (Exhibit Z) with the Arizona Supreme Court, again raising claims of:  (1) prosecutorial misconduct; (2) improper amendment of the indictment; (3) the trial judge lacked jurisdiction because he hadn't immediately upon appointment taken his oath of office, and his appointment then lapsed.   On February 6, 2014, the Arizona Supreme Court summarily denied review.  (Exhibit AA.)

**F.  PRESENT FEDERAL HABEAS PROCEEDINGS**

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on June 24, 2014 (Doc. 1).  As summarized in the service Order, Petitioner's Petition asserts the following four grounds for relief:

> In Ground One, Petitioner alleges a claim for **prosecutorial misconduct** in violation of his Fifth, Sixth, and Fourteenth Amendment rights. In Ground Two, Petitioner alleges that the **indictment** was insufficient. In Ground Three, Petitioner alleges that the judge lacked jurisdiction because he had not taken the **oath of office** at the time of Petitioner's trial. In Ground Four, Petitioner alleges that the judge ignored the law in **charging the jury**.

(Order 10/8/14, Doc. 5 at 2 (emphasis added).)

**Response** - On January 6, 2015, Respondents filed their Limited Answer (Doc. 11).  Respondents argue that Ground 1 is without merit, Grounds 2 and 3 are not cognizable on habeas review, and Ground 4 is procedurally defaulted.

**Reply** - On February 2, 2015, Petitioner filed a Reply (Doc. 12).  Petitioner argues: (1) Ground Two is founded upon his rights under the Fifth, Sixth and Fourteenth Amendments; (2) Ground Three is founded upon Article 6, Section 3 of the U.S. Constitution; (3) Petitioner has exhausted a variety of avenues to exhaust his claims regarding the lack of jurisdiction, including letters to various executive officers (the Governor, Attorney General, and County Attorney), and filed a Petition for Special Action with the Arizona Court of Appeals; (4) the Arizona Court of Appeals' rejection of his claims on insufficiency of the evidence are contrary to *Ex-parte Bain*, 121 U.S. 1 (1887), overruled by *U.S. v. Cotton*, 535 U.S. 625 (2002); (5) failure to fairly present the claim in Ground 4 under federal law was the result of his lack of legal resources and surprise at rejection of his state law claim; and (6) his claims of prosecutorial misconduct are supported by the record.

/ /

/ /

/ /

/ /

### III. APPLICATION OF LAW TO FACTS

**A.  GROUND ONE: PROSECUTORIAL MISCONDUCT**

**1.  Arguments**

In Ground One, Petitioner argues that the prosecutor engaged in misconduct by: (1) telling jurors in opening statements that the only reason the state had not prosecuted the 2006 case until May 2011 was because the State was waiting on DNA evidence, a false claim because DNA testing results had been returned long before; (2) offering her own "testimony" in opening statements that Petitioner believed he had trial the day of the arson; (3) vouching for witnesses by arguing C.C. and S.F. had no motive to lie; and (4) a laundry list of citations to the record, devoid of argument.  (Petition, Doc. 1 at 6, 12-14.)

Respondents argue that, as found by the Arizona Court of Appeals, this claim is without merit because there was no misconduct and any error was harmless. Respondents argue that the comments on the failure to prosecute earlier were not violative of the trial court's order, any error was rendered harmless by trial counsel's rebuttal in opening statements and the ultimate acquittal on the sexual assault charges. (Answer, Doc. 11 at 21-22.)  With regard to the "testimony" on Petitioner's belief as to the trial date, Respondents argue that any error was rendered harmless by refuting evidence presented by the defense, the prosecutor's admissions on the topic in closing argument, and an instruction to the jury on counsel's request. (*Id.* at 24.)  With regard to the vouching, Respondents argue that the comments were not vouching, but proper comments on the evidence, and rendered harmless by the trial court's instructions, and the harmlessness is demonstrated by the acquittal on the sexual assault and other charges. (*Id.* at 24-25.)  Finally, Respondents argue that Petitioner fails to show prejudice. (*Id.* at 25-28.)

Petitioner replies that the prosecutor acted in bad faith, and in light of the weak evidence against Petitioner, prejudice has been shown.  (Reply, Doc. 12 at 4.)

**2. Standards of Review**

**Standard Applicable on Habeas** - While the purpose of a federal habeas proceeding is to search for violations of federal law, in the context of a prisoner "in custody pursuant to the judgment a State court," 28 U.S.C. § 2254(d) and (e), not every error justifies relief.

**Errors of Law** - "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24– 25 (2002) (per curiam).  To justify habeas relief, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted.  28 U.S.C. §2254(d)(1).

**Errors of Fact** -  Federal courts are further authorized to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable."  *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

Moreover, a state prisoner is not free to attempt to retry his case in the federal courts by presenting new evidence.  There is a well-established presumption of correctness of state court findings of fact.  This presumption has been codified at 28 U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has the burden of proof to rebut the presumption by "clear and convincing evidence."

**Applicable Decisions** – In evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision.  *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

**No Decision on the Merits** – The limitations of 28 U.S.C. § 2254(d) only apply

where a claim has been "adjudicated on the merits in State court." Thus, where a petitioner has raised a federal claim to the state courts, but they have not addressed it on its merits, then the federal habeas court must address the claim *de novo*, and the restrictive standards of review in § 2254(d) do not apply. *Johnson v. Williams*, 133 S.Ct. 1088, 1091-92 (2013). *See id.* (adopting a rebuttable presumption that a federal claim rejected by a state court without being expressly addressed was adjudicated on the merits).

**3. Applicable Law on Prosecutorial Misconduct**

**Denial of Fair Trial** - Generally, in assessing claims of prosecutorial misconduct on habeas, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)).   "The relevant question is whether the prosecutors' [misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id*. (quoting *Donnelly*). *See also, Drayden v. White*, 232 F.3d 704 (9th Cir. 2000).

In applying *Darden,* the Ninth Circuit has employed a two-step inquiry: (1) were the prosecutor's actions improper; and (2) if so, was the trial rendered "fundamentally unfair." *Drayden v. White,* 232 F.3d 704, 713 (9th Cir.2000).

Prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Greer v. Miller*, 483 U.S. 756, 765 (1987)(quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)); *Bonin v. Calderon,* 59 F.3d 815, 843 (9th Cir. 1995).  The misconduct is reviewed in the context of the entire trial.  *See Greer v. Miller*, 483 U.S. at 765-66 (a single question, an immediate objection, and two curative instructions "clearly" indicated the prosecutor's improper question did not violate due process); *Donnelly v. DeChristoforo*, 416 U.S. 637, 639, 643 (1974).

But we do not grant habeas petitions solely because a prosecutor

8

erred. Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial. We grant habeas relief for prosecutorial misconduct only when the misconduct prejudiced the petitioner. We determine whether the petitioner suffered prejudice by placing the improper comments in the context of the entire trial. To do that, we look to the weight of the evidence submitted against Trillo, the prominence of the erroneous comments in the entire trial, whether the prosecution misstated the evidence, whether the judge instructed the jury to disregard the comments, whether the comment was invited by defense counsel in summation, and whether defense counsel had an adequate opportunity to rebut the comments. In examining those suggested areas of concern, we evaluate whether there was a "reasonable probability" that the jury would have reached a different result without the offending comments.

*Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) (citations omitted).

Finally, when evaluating whether a prosecutor's conduct denied a defendant a fair trial, the court must consider the cumulative effect of various incidents of misconduct. "Even when separately alleged incidents of prosecutorial misconduct do not independently rise to the level of reversible error, "[t]he cumulative effect of multiple errors can violate due process." *Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012) (quoting *United States v. Nobari*, 574 F.3d 1065, 1082 (9th Cir.2009).)

**Forms of Prosecutorial Misconduct** – The courts have never enumerated a definitive list of actions which qualify as misconduct. *See Generally* Gershman, *Prosecutorial Misconduct* (2d ed.) (identifying 13 major categories of prosecutorial misconduct); *id.* at Chapter 11 (identifying 39 categories and subcategories of misconduct in summation).

But, Petitioner's arguments touch upon two key areas: (1) asserting facts not supported by the evidence; and (3) vouching for witnesses. Even in these areas, however, explicit guidelines for determining misconduct are few, and generally focus, properly, on the effect upon the fairness of the trial.

Arguing Facts Not Supported by Evidence – "A prosecutor is not permitted to comment on matters outside the record. By going beyond the record, the prosecutor becomes an unsworn witness, engages in extraneous and irrelevant argument, diverts the jury from its proper function, and seriously threatens the defendant's right to a fair trial."

9

*Prosecutorial Misconduct*, *supra* at § 11:32.  *See Douglas v. State of Alabama*, 380 U.S. 415 (1965) (error in permitting prosecutor to read statement of co-defendant in questioning, in the face of co-defendant's insistence on right to not testify); *Frazier v. Cupp*, 394 U.S. 731 (1969) (no error in inclusion of expected testimony in opening statements, even though witness ultimately insisted on right to not testify).

<u>Vouching</u> - "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoec*hea, 986 F.2d 1273, 1276 (9th Cir.1993) (as amended).

<u>Bad Faith</u> – Petitioner makes allegations that the prosecutors acted in bad faith. While bad faith may be relevant to finding misconduct, it does not mandate relief because "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**4.  Ground 3A – Delay in Prosecution**

**a.  Factual Background**

Prior to trial, the State filed a Motion in Limine, seeking an order "precluding the defense from eliciting testimony through witnesses or during opening and closing arguments that the Maricopa County Attorneys' Office declined to file charges against the defendant and to preclude opinion testimony from any investigator regarding the believability of the victim."  (Exhibit HH, MIL at 3.)  The State argued that such evidence was not relevant.  The motion was granted without opposition.  (Exhibit II, M.E. 5/18/10.)

During opening statements, however, the prosecutor raised the issue:

> Now, the initial responders who came to the hospital are the ones who oversee the investigation. . . . Back in 2006, it was a Detective named Carl Martin. So he was the one who became assigned to investigate the crime of the male nurse who sexually assaulted [C.C.]. And he'll tell you that these types of cases are

10

extremely hard to investigate and extremely difficult to prosecute. Back in 2006, he'll tell you the Phoenix Crime Lab was backed up for months, so backed up that there was no way that biological evidence . . . could be analyzed in a quick manner. And you'll hear that the DNA crime lab was so backed up that they had to send the specimens over to another lab for analysis. So without that information, Detective Martin's hands were tied, and unfortunately for [C.C.], her case lay dormant. It lay silent, and this male nurse amazingly gets away with a crime. He's a free man, and he still has his nursing license. And that's where we are in 06.

(Exhibit D, R.T. 5/26/10 at 176–77.)

During Petitioner's subsequent opening remarks, defense counsel responded to the prosecutor's statements resulting in an objection:

MR. COUNTRYMAN: . . .[The prosecutor] says that, well, there was a . . . delay in the investigation. You heard the State tell you, I hope you wrote it down because if you didn't, write it down now; the State told you in their opening statement there was a delay in the process of the DNA in this case and so it sat dormant; you heard that. Write it down because it's not true.

The delay in this case was because of Ms. Coulter's refusal to cooperate with the Nursing Board. All she did was threaten a lawsuit and call News Channel 3. That was her reaction. And let me talk to you a little bit about the person she called to help her.

* * *

And so there's 2006 case which they claim was delayed. They said that to you, that it was delayed because of DNA. It is completely untrue. They didn't file the case because of refusal to cooperate, and the lead detective in that case didn't believe the victim; she wrote it in the – –

MS. WU: Objection

MR. COUNTRYMAN:  They opened the door, Your Honor.

THE COURT:  I don't think so.  We'll discuss this after the  - -

MS. WU:  State moves to strike.  State moves to strike.

THE COURT:  Go to another area please, Mr. Countryman.

(*Id*. at 193, 197.)    At the conclusion of opening remarks, the trial court instructed the jury:

THE COURT: Thank you, Countryman.

Ladies and gentlemen, let me make two comments, and then I'll tell you what we're going to do next. I told you earlier that the statements and arguments of counsel are not evidence. The purpose of an opening statement is designed merely to give you a road map or to tell you what counsel expect the evidence might might [sic] show.

You've still heard no evidence in the case; none. This

1
2
3

is just a guide by both parties to try to give you some framework or outline within which to put what the evidence is in the case. You've heard no evidence at all. You'll have to decide the case based on the evidence; excuse me. Arguments and statements of counsel are not evidence. I hasten to remind you about that.

4
5

(*Id*. at 208.)   The jury was eventually excused, and the trial court addressed the parties as follows:

6
7
8
9
10
11
12
13
14
15

Hey, look; this is not nice new torpedo on the trial judge unexpectanly [sic].   Listen on both sides.   On May 18th, I granted the State's motion to preclude any mention of the prior charges reviewed but not filed for victim [C.C.] without opposition by the defendant. That was my ruling.

So following that ruling, sure as heck, prosecutor gets up and argues to the jury: Well, reason we didn't file any evidence is because there was a back–up in the crime lab and we wanted to process the DNA evidence, but the Phoenix Crime Lab says there is no way we're going to get any evidence to you because it's going to take like forever and forty–eight days, and we'll never get it back to you, so we decided not to file charges; thereby giving Mr. Countryman the brilliant and perfect opportunity to say: No, the reason you didn't file charges was because the detective reviewed [C.C.'s] testimony and thought that she was a liar and didn't believe a word she said.

Now what I've got is the State taking advantage of a ruling I made in the State's favor to open the door to permit [defense counsel] to make an argument, which I specifically told him not to.

16
17
18
19
20
21

(Id. at 210–211.)   The state then argued that the motion was directed at evidence on the investigator's "personal opinion of not believing [C.C.]" and the charging decision by the County Attorney's Office.   (*Id*. at 211-212.)   The state argued that the prosecution's opening statement was not to assert that the delay in testing was the "sole reasons that this case was not charged."   (*Id*. at 212.)   After argument by the defense, the trial court concluded:

22
23
24
25
26
27
28

THE COURT: Listen, sit down. I heard the state's opening statement. Whether it was intentional or not, the impression clearly left in my mind and in the minds of the jury, and I don't want to have to order a transcript and go back and peruse every word, but the impression parlayed to me…that [the prosecutor] was saying because of the crime lab back-up, we decided not to file the charges on the [C.C.] matter.  And I realize you can argue differently.

I know there was an issue in your mind -- motion, sort of sauce for the goose is sauce for the gander argument; we tell the jury to ignore the decision to charge.

You're also asking me to tell the jury to ignore the decision not to charge and just keep that out of the evidence. I think Mr. Countryman had to say what he said to the jury. I would have, if

1    I were in Mr. Countryman's position. The objection that [the
2    prosecutor] made was overruled, so the argument will stand. I don't
     think anything more needs to be done here, but 1'm going to tell
3    both sides right now that it's either – the charging decision is either
     going to be in the case or it's going to be out of the case, all right,
4    but it's not going to be halfway in the case and halfway out of the
     case. All right.
5            And if the State wants to argue that there was a crime
     lab back-up and somebody says it's going to take too long to get the
6    stuff back, then as far as I'm concerned, it's fair game for Mr.
     Countryman to argue until the cows come home that the police
7    didn't believe the victim, that the County Attorney didn't believe the
     police officer, that the County Attorney didn't believe the victim, or
8    the County Attorney didn't believe in the County Attorney, or 15 of
     any other 80,000 reasons why the case wasn't charged, but it's either
     going to be in the case or out of the case.
                                    * * *
9            But I'm going to warn Ms. Wu and Mr. Telles, if you
10   want to get into this in trial or you start talking about crime lab
     back-ups and delays in the face of the statement that's already been
11   made to the jury that this is why we didn't charge, then we're going
     to have a problem precluding Mr. Countryman from representing
12   his client in my court to rebut the inference that the charges weren't
     filed because of the crime lab back-up.

13   (*Id.* at 214-216.)

14       In closing arguments, the prosecutor again posited a theory for failing to bring the

15   charges in 2006.  "Connie's incident happened four years ago. And you know that four

16   years ago, it wasn't thoroughly investigated." (Exhibit N, R.T. 6/15/10 at 129.)  Defense

17   counsel eventually objected (having reserved his objections as directed by the trial

18   court), and asserted that not only was the reference to an incomplete investigation

19   improper, but the remarks in opening statement about delayed DNA was improper and

20   justified a mistrial.  (*Id.* at 136-137.)  Over objection by the prosecution that doing so

21   immediately after the prosecution's argument amounted to an admonishment of the

22   prosecution, the trial court instructed the jury again on the issue:

23           THE COURT:  …Folks, I want to say a couple things
     to you before we proceed.  At the beginning of the case, I told you
24   that you have to decide the facts from evidence presented in court.
     Evidence consists of testimony of witnesses, documents, and other
25   exhibits or facts agreed to by the parties.  That's on the top of page
     eight of your preliminary instructions.
26           I also directed you that statements or arguments made
     by the lawyers in the case are not evidence.  We talked about that.
27   This applies to both the State's and the defendant's arguemnts [sic].
     And I told you at the beginning of the trial, you have to make your
28   decision based upon what you recall of the testimony.  That's what

                                    13

1
2

you determine.  It applies to both sides.  Both arguments - - both counsel are entitled to take certain inferences, flexibility of their final arguments, but keep in mind, you're the judges of what facts are, and the statements of either counsel are not evidence.

3

(*Id.* a 140).

4
5

Defense counsel then proceeded with his closing arguments, and eventually addressed the issue again.

6
7
8
9
10
11

MR. COUNTRYMAN:  . . . And what the State told you in their opening statement was, this 2006 case was delayed. Remember when they told you it was delayed because of the DNA, there was some delays in the DNA and it stopped this case from proceeding?  Well, we know that wasn't true, because we know by December 2006, the DNA results were done and you heard from Detective Martin, who was the investigating officer in that case, and now come fast-forward, and the State makes statements in their opening statements that they can't prove, and now what they will tell you is that case wasn't fully investigated.  That's their position now.

12
13
14
15

Well, we know that's not true, as well.  We know the DNA test was done and completed in December of 2006.  We know Connie Colter was interviewed twice.  We know James Williams was interviewed twice.  We know all of the nurses were interviewed.  We have - - no medical records were obtained.  We know that everything - - oh, and by the way, Detective Nelson, who actually is the one who filed charges in this case in 2009 or submitted charges for filing, we know he didn't do anything except get the DNA, pick up the DNA, and look at it and misinterpret it.

16
17
18
19

So once again, the State has stood up here in front of you and made a representation about a fact that is not true.  And I would submit to you the case was not submitted and it wasn't filed because there was no - - there was not enough evidence to charge it. And nothing has changed, and nothing has changed since that determination in 2006; nothing has changed on that case.

20

(Exhibit N, R.T. 6/15/10 at 146-147.)  In addressing the testimony from the victim C.C.,

21

counsel argued:

22
23
24
25
26

And then the State claims to you in their opening that the case wasn't filed because of the DNA.  Not true.  You'll have Exhibits 63 and 64, and look at the dates.
The DNA is done in December of 2006.  There is some follow-up tests ordered, but its basically done in about four months.  Okay.  And you'll note that in that case, 2006 case was not filed until January of 2009. So the only inference from that we can take is that that case was proven to be false and nothing has changed since then.

(*Id.* at 155.)

27
28

14

### b.  State Court Decision

The Arizona Court of Appeals found:

> The trial court considered the prosecutor's statements and, as a curative measure, permitted defense counsel to tell jurors in his opening statement that the comments about the 2006 case were lies and that DNA results had in fact been received but not pursued by the police department based on a lack of cooperation by the victim.

(Exhibit Y, Mem. Dec. at 7.)  The court opined:

> The trial court was in the best position to determine the effects of the prosecutor's comments on the jury. In reviewing acts of prosecutorial misconduct, the question "is whether the misconduct affected jury's ability to fairly assess the evidence." Because Williams was acquitted of the sexual assault charges, it is clear that any misstatements about the 06 matter did not prejudice Williams.

(*Id.* at 7-8 (citations omitted).)

### c.  Application of Law

**Misconduct -** Respondents argue that Petitioner has failed to demonstrate misconduct because the record does not reflect a violation of the trial court's order. (Answer, Doc. 11 at 21.) The undersigned is not convinced.

It is true that the State's motion was very specific in its request to preclude evidence on only two issues: (1) the Maricopa County Attorneys' Office decision to decline the prosecution in 2006, and (2) investigators' opinions on the believability of C.C., and the trial court's order simply granted that motion. (*See* Exhibit HH, MIL; Exhibit II, M.E. 5/18/10.)  Had the prosecutor simply referenced delays in obtaining DNA results, it might be accepted that the comments were simply art of the *res gestae*. But, instead, the prosecutor explicitly referenced the fact that "these types of cases are…extremely difficult to prosecute."  (Exhibit D at 176.)  It is also plain that the prosecution was attempting to interject into the minds of the jury the County Attorney's Office rationale for not bringing the case earlier, despite having sought to preclude that very evidence as irrelevant.  To the extent that the assertion did not violate the letter of the trial court's order, it certainly violated its spirit and was a repudiation of the State's

15

basis for seeking the order, *i.e.* the lack of relevance of such matters.

Nor does it appear that either the trial court or the Arizona Court of Appeals were convinced.  The trial court concluded that the prosecution was "taking advantage of a ruling I made in the State's favor," by trying to interject the issue while at the same time seeking to preclude the defense from rebutting it. (Exhibit D, R.T. 5/26/10 at 214-216.)  At a minimum, the Arizona Court of Appeals considered the prosecution's references to the 2006 prosecution as "misstatements."  (Exhibit Y, Mem.Dec. at 7.)

**Prejudice** – On the other hand, Petitioner proffers nothing to refute the determination of the Arizona Court of Appeals that there was no prejudice.

The net effect of the proceedings on this issue is demonstrated by the fact that the jury acquitted Petitioner on the sexual assault charges, as well as other substantial charges.  At least on these charges, the favorable result precludes a finding (at least in Petitioner's favor) that the outcome of the trial would have been different but for the offending statements.

Even with regard to the offenses on which Petitioner was convicted, the culmination of events surrounding this issue demonstrate the Petitioner was not denied a fair trial.

The defense was able to effectively turn the prosecution's error to its benefit by forcefully asserting ("write it down") to the jury the very thing that the prosecution had hoped to avoid, namely that the 2006 complaint had not been prosecuted for reasons other than delays in the DNA, including the intransigence and lack of credibility of the complainant.  In addition, the defense was able to argue specifically that there had been no delay in the DNA.   Indeed, defense counsel even sought, belatedly and unsuccessfully, to withdraw a successful objection when C.C. began to testify that the detective told her the DNA testing was delayed.  (Exhibit E, R.T.  at 64-65.)  And, in closing arguments, defense counsel forcefully used the prosecution's statements against it, pointing to the repeated failure to present evidence to support its asserted reasons for not prosecuting in 2006, and asserting that the real reason was "there was not enough

evidence to charge it."  (Exhibit N, R.T. 6/15/10 at 147.)

Moreover, the Supreme Court has recognized that although not a panacea, appropriate instructions may avoid the harm from prosecutorial misconduct. *See e.g. Greer v. Miller*, 483 U.S. 756, 766 (1987) ("a single question, an immediate objection, and two curative instructions" sufficient to avoid due process violation).  Here, the trial court repeatedly instructed the jury that the opening statements, and closing arguments, were not evidence.  The final instruction on this issue came directly on the heels of the prosecution's closing argument.

In sum, rather than being denied a fair trial by the prosecutions' references to the delay, the door was opened for the defense to paint the prosecution as attempting to explain away its weak case with factually unsupported excuses and to present powerful arguments on the lack of credibility of the prosecutor.

**5.  Ground 3B – "Testifying" About Trial Date**

**a.  Factual Background**

During opening statements, the prosecutor made the following statements regarding the plot to commit the arson:

> Now, what is imperative, what …the defendant continues to stress to [co-conspirator] Swan is that this has to be taken care of by March 19th. March 19th is the important day. It is the day when the defendant believes he was set for trial for sexual assault. And you'll hear that he was mistaken.
> You'll hear that before cases go to trial, there is pretrial conferences with the Court, there are status conferences with the Court, there is meetings with the Court and while they -- while, yes, there was a court proceeding on March 19, 2009, you'll hear that it wasn't a trial and that in actuality, it was just a pretrial conference with the Court. So although he got it wrong in his mind, it was what he thought was his trial date.

(Exhibit D, R.T. 5/26/10 at 186-187.)

During trial, after an unrecorded conference with counsel, the trial court pronounced to the jury:

> THE COURT: I'm entitled to instruct you that you should accept as a fact that the defendant, Mr. Williams, was present in the Maricopa

County Superior Court on March 19, 2009. Okay. You should take that as a fact established for purposes of the case. I'm taking judicial notice of that fact, and it is a fact.

(Exhibit J, R.T. 6/8/10 at 163.)   Later, after the jury was excused, the trial court addressed counsel:

> THE COURT: Sit down. I want to have a chat with you about two things. First thing is, I want the record to reflect an unrecorded bench conference when counsel asked to approach.
>        Ms. Wu showed me a minute entry dated March 19th, 2009. It was a minute entry of a complex case scheduling conference and reflected that Mr. Williams, Mr. Feldman, Ms. Wu were all present in my courtroom.   Over Mr. Countryman's objection, I was asked to take and did take judicial notice of the Court's own record. I have confirmed with my clerk that this is an accurate minute entry, and that led up to my instructing the jury over Mr. Countryman's objection that the defendant was present in court. I did not say my Court. It was in the Superior Court on March 19th.  That's the first item.

(*Id.* at 181-182.)   The following day, in cross-examination of Petitioner's ex-wife, defense counsel elicited the following testimony:

> Q. BY MR. COUNTRYMAN: And you know that this bond hearing finally got set; correct?
> A. Yes.
> Q. And this bond hearing was on March 19th; correct.
>        * * *
>        THE WITNESS: Yes.
> Q. BY MR. COUNTRYMAN: Well, you went to a bond hearing on March 19th; didn't you?
> A. Yes.
> Q. And you had conversations with Mr. Williams about the bond hearing that's going to take place; isn't that right?
> A. Yes.
> Q. And in that period in January when he got arrested until -- up until March, that bond hearing,  there was only a couple of months; isn't that right?
> A. Yes.
> Q. And in that couple of months, Mr. Williams never told you he was going to trial on March 19th; did he?
> A . No.
> Q. And you knew he wasn't going to trial on March 19th isn't that right?
> A. Correct.
> Q. The issue on March 19th was whether or not he was going to get bond set so you or you guys could get him out pending the charges; correct?
> A. Correct.
>        * * *
> Q. And James never told you he was going to trial; did he?
> A. No.
> Q. You did have conversations with James about speedy trial

18

rights? Do you remember talking to him about speedy trial rights?
    A. Yes.
    Q. And you remember specifically talking to James about, well, if he exercised his speedy trial   rights, he may be able to get to trial by June, something of that nature?
                  * * *
    THE WITNESS: Yes.
    Q. BY MR. COUNTRYMAN: Do you recall that?
    A. Yes.
    Q. And so James gave you no impression that on March 19th, that he was going to somehow miraculously have a trial two months after being charged; right?
    A. There was no trial for March 19th.

(Exhibit K, R.T. 6/9/10 at 38-41.)  On redirect, the prosecution got the witness to admit that the bond hearing she remembered attending may have be in February.  (*Id.* at 49-50.)

Eventually, defense counsel argued that the representation of a belief of trial on March 19th hadn't been proven and that (along with other deficiencies in the prosecution's case) justified a dismissal of the arson related counts.

    And we have no information on what this plot was, Judge. Their theory of the case was that Mr. Williams wanted somebody killed by March 19th because he thought it was his trial date. They didn't present any evidence of that and I'm asking the Judge to preclude them from arguing that.

(Exhibit N, R.T. 6/15/10 at 9.)  The motions were denied.  (*Id.* at 12.)  The Court also addressed the defense's proffer of tapes of jailhouse conversations "to rebut the State's argument that Williams thought his trial date was coming  up on March 19th."  (*Id.*)  The prosecution challenged the proffer:

    MR. TELLES: Well, Your Honor, as I state in my motion, and Mr. Countryman just acknowledged that any statement regarding the defendant's thought of his trial date was stated by Ms. Wu during her open evidence, which is not evidence, and he acknowledges that we did not present any evidence about whether or not it was a court date, what the State did is –
    THE COURT:  Well, there was already evidence that he knew there was a court date.
    MR. TELLES: There was a court date, not a trial date.
    THE COURT: Right.
    MR. TELLES:  He wants to preset this evidence that he thought it was his trial which, first of all, it's cumulative. We already presented jail tapes.  Second, he doesn't get to present self-serving hearsay statements in a way to circumvent having to testify.
    THE COURT:  Look, time out.  One of the teachable moments in this trial, I hope it's for Peggy's furture [sic] career where she's going to learn from this trial to be very, very careful what she says in opening statement because you can open the door

to a manner of things, and it happened at least on two occasions in Peggy's opening in this case, and this is one of them.

And because the matter has been injected, in my view improperty [sic] to the jury, it behooves the State to  come in here on  the  fourth  week  of  trial  and  argue  that,  well,  gee  whiz,  my prosecutor  colleague  just  made  a  misstatemnt  [sic]  to  the  jury, forgive  and  forget;  assume  the  rest  of  your  argument  is  the statements of counsel are not evidence.

I think Ken is entitled. That's fair game, and he can offer it for that purpose, and I'm not pursuaded [sic] by that argument. It's not going anywhere with me. So my question is: Mechanically, how do you want to proceed at this point?

(*Id.* at 13-14.)   Eventually, defense counsel proposed to recall Petitioner's ex-wife to address the issue:

MR.  COUNTRYMAN:  Well,  I  don't  want  to  play  it. That's my point. I don't want to play it.

THE COURT: Okay. All right.

MR.  COUNTRYMAN:  So  I'm  just  going  to  recall [Petitioner's ex-wife], and -- but I won't even ask [her], if the Court is telling me that they are going to instruct the jury  that they are not allowed  to  argue  in  closing  that  he   thought  it  was  trial.  Then  I'm not even going to raise that issue.

THE COURT:   I just heard Mr. Telles say that they are not going to argue that; right?

MR. TELLES: Yes, Your Honor.

THE COURT: Okay. Stop. Stop.

MR.  COUNTRYMAN:  Okay.  Then  that's  fine.   Then I'll call [Petitioner's ex-wife] and cover issues, and I don't think - - I won't even offer the jail tapes now.

THE COURT:  You're kinder than I am. My 30 years of  trial  experience  tell  me  when  I've  had  motions  to  strike  opening statements,  the  absolute  best  thing  that  can  happen  to  a  lawyer  is when the other lawyer says something in opening statement that he or she can't prove, because there is nothing that's so diminishes a lawyer's credibility.

And,  Peggy,  I  really  hope  you  learn  from  this  by making statements to a jury in opening statement because the other side, a very good trial lawyer like Countryman, is going to take that and destroy you the next time that happens.

So let's leave that where it is.

MR.  COUNTRYMAN:  I'm  not  saying  that's  not  going to happen, but I'm not going to deal with it through the tapes. I can deal with it otherwise.

(*Id.* at 16-17.)   Defense counsel did recall Petitioner's ex-wife.

Q.  Okay.  And  you  said  he  was  frustrated.  At  any  point  in time, from the time he got in jail in January through the process, did he -- did his  frustration level subside?

A.  Yes.  He  realized  that  he  was  going  to  be  in  there  for  at least six to nine months.

Q. And he talked to you about that; isn't that right?

A. Yes.

20

Q. And wasn't part of this frustration with his first attorney
was, his first attorney filed a motion that changed his last day from
June to October?

THE WITNESS: Yes.

Q.  BY MR. COUNTRYMAN: And he wanted to go to trial
by June; is that right?

A. He wanted to go to trial.

Q. Okay. Now, in your conversations with James, did he ever
tell you that he thought he was going to trial on March 19th, or the
day of the hearing, on March 19th?

A. We had a conversation, and it was about a pretrial for the
19th.

Q. But not a trial with witnesses? No?

A. No.

(*Id.* at 31-32.)

At closing arguments, the prosecutor immediately addressed the March 19th issue,
albeit without reference to a trial.

THE COURT: …Ms. Wu, you may make your
argument, ma'am

MS. WU: Thank you, Judge. The defendant wanted
and needed for Sandra Fay to be killed. He needed her to be dead,
because he knew that if she was still alive on March 19th, 2009, that
he would not be able to go home after his court date.

MR.  COUNTRYMAN:  Objection; there  is  no
evidence of that, Your Honor.

THE COURT: Objection is overruled.   Please
continue.

MS. WU: So he conspired to have Sandra Fay killed
and a fire bomb was thrown through her window on March 19th in
the middle of the night. On that night, Sandra Fay, she's asleep in
her home, in the comfort of her own bed, with her mother who is
visiting in the bedroom beside her, peaceful, quiet, just an everyday
night at home, and then all of a sudden, she is woken up to a crash
through her window and she opened her eyes and sees flames
allover her room.

There is fire on her curtains.

MR. COUNTRYMAN: Objection; there were not
flames all over the room. Move to strike.

THE COURT:  The objection is overruled.

Ladies and gentlemen, as I told you previously,
statements of counsel are not evidence.  They are just statements of
counsel.  Okay.  Please keep that in mind.

Mr. Countryman, you and Ms. Wu are both going to
be allowed some opportunity to have flexibility and freedom of
counsel to argue. You've made two objections in the last seconds.
At some point, it becomes very disruptive to the point that I may
instruct you to sit down and reserve your objections to the next
possible recess, and object if you have to, but I'm going to ask both
counsel to extend the courtesy to the other in their argument.

Go ahead, Ms. Wu.

(*Id.* at 81-82.)  Later in argument, the prosecutor circumscribed her argument:

21

The day before March 19th, bad news. Swan hasn't heard from Deason; no confirmation that anything has been done. So he's worried; he's concerned. There is nothing he can do at this point, because his court day is tomorrow, so he says: You know what, let's just wait and see what happens.

(*Id.* at 104.)  But then again alluded to March 19th as the trial date:

You know, it's in code. You know that what he wanted was for Sandra Fay to be killed by March 19th.  And about three and a half or four weeks ago, we made our opening statements and you heard me tell you that he thought March 19th was his trial date, but now we have heard all of the evidence and now we know that March 19th was a court date. So March 19th comes and goes.

(*Id.* at 105.)  After the prosecution concluded, defense counsel asserted his objections:

THE COURT: You wanted to see me.
MR. COUNTRYMAN: Oh, yeah, Judge. I'm going to -- the Court told me to reserve my objections, so the Court -- I'm just going to interpose it now with the Court.
THE COURT: Go ahead. Take your time.
MR. COUTNRYMAN:  First and foremost Judge, with regard to the State, I'm going to ask for a curative instruction with regard to this March 19th date. The State simply presented no evidence about that date. They told the jury in trial that - - in their opening statement, that he wanted her killed on March 19th because he thought it was his trial date and that he  thought he had to that day.
Now, she turned around and says that, well,  we learned through the course of the case that was a pretrial and now they thought that much they needed her  to pursue a case. They have never presented any information like that, Judge, and now they are vouching.  It's disingenuous and inappropriate.  I'd ask for a curative instruction that the jury should disregard the State's argument with regard to the March 19th date and whether or not the State could pursue a case without a victim because, first of, it's not true.
Second of all, in this case, there are two victims, not one victim; and third of all, they presented nothing to say that they couldn't pursue a case without a victim, and they didn't present any evidence that anybody thought that. They didn't -- they presented tons of tapes. My client never said that and it's inappropriate.  It's improper to change theories and vouch and now say,  well, now, we believe that they couldn't pursue a case  without the victim and he wanted her dead, so that's with  regard to that.

(*Id.* at 133-135.)  After addressing a number of other objections, counsel concluded:

So based on the completely inappropriate closing statement -- I mean, Your Honor, you shut me down. That's fine. You allowed me to reserve my objections at the break and that's fine, Judge, but Ms. Wu went way far afield in vouching, inappropriately arguing, in changing theories, which is vouching, and completely misinterpreting and misrepresenting the nature of the evidence in

22

this case based on this Court's prior instructions, Judge.

(*Id.* at 137-138.)   As discussed with regard to Ground 3A, hereinabove, the trial court then deferred ruling on the motion for mistrial, and proceeded (over the prosecution's objections) to issue a curative instruction before the defense made its arguments.

In closing arguments, defense counsel addressed the issue:

> He doesn't like what his lawyer did in terms of the changes in his court date and pushing his court date offer. He did want to -- a bond. I think the State  and I agreed, although the State claimed in their theory that the reason why he wanted to kill Sandra Fay was because he wanted her killed so she didn't show up to  trial on March 19th.
> Well, that was completely disproved and I  think the reason why that is extremely important is the  evidence is going to be pretty overwhelming, and you'll see this, is Sandra Fay geting [sic] killed wasn't going to  help him get released on March 19th. It wasn't going to   help him get released on March 19th. What he needed from   Sandra Fay is what Sandra Fay told him during the confrontation call.

(*Id.* at 171.)

### b. State Court Decision

The Arizona Court of Appeals rejected this claim.  The court found:

> In terms of the alleged motive for the arson, Williams presented evidence that he did not believe he had trial on the day the Molotov cocktail was thrown through S.F.'s window.

(Exhibit Y, Mem. Dec. at 7.)  The court rejected the claim, concluding:

> And Williams had a full and fair opportunity to rebut the State's claimed motive for the arson.

(*Id.* at 7-8.)

### c.  Application of Law

**Misconduct** – The Arizona Court of Appeals made no finding on whether the prosecution had engaged in misconduct.  But, the conduct, admonishments, and curative instructions by the trial court demonstrate that the prosecutor engaged in repeated and blatant misconduct in making representations to the jury which were clearly not supported by any evidence in the case.

1     **Prejudice** – The Arizona Court of Appeals concluded that Petitioner was not

2 prejudiced, citing the evidence controverting the prosecutor's opening statements and

3 closing arguments.  Petitioner proffers nothing to suggest that this was an unreasonable

4 determination of the facts or an unreasonable application of or contrary to Supreme

5 Court law.

6     Further, the trial court issued repeated and pointed curative instructions.  "A trial

7 judge may cure the effect of improper prosecutorial comments by admonishing counsel

8 to refrain from such remarks or by giving appropriate curative instructions to the jury."

9 *United States v. Endicott*, 803 F.2d 506, 513 (9th Cir. 1986) (quotations omitted).

10 Moreover, as noted by the trial court, a prosecutor's attempts to offer or argue facts

11 which are plainly unsupported by the evidence often backfires. Under the circumstances,

12 the likely affect of the prosecutor's persistence on this point was a loss of credibility with

13 the jury, not a decision based on the prosecution's unsupported assertions.

14

15 **6.  Ground 3C – Vouching for Witnesses**

16     **a.  Factual Background**

17     During closing arguments, the prosecutor addressed various means for the jury to

18 evaluate the credibility of witnesses, including their ability to recall details, their

19 demeanor, and their motivations.  (Exhbiit N, R.T. 6/15/10 at 182-184.)  With regard to

20 the latter, the prosecution argued:

21         And then you want to know who has motive to lie, who has a
        financial or who has some kind of gain in this case. [The victim
22         C.C] has no motive to lie. Her case happened four years ago.
        Nothing happened four years ago, and she comes to court and she
23         testifies? She didn't sue the hospital; nothing happened in her case
        and she's coming to court to tell you what she remembers.
24         And the same goes for [the victim S.F.]. Although she had
        filed a lawsuit against the hospital, she wants justice. She wants to
25         make sure that the defendant is held accountable for everything that
        he's done in the criminal arena and in the civil arena. She wants to
26         make sure that she's covered.
        The nurses at the hospital, they don't have any -- they don't
27         really care what happens in this case.  They told you what they saw
        and most of them told you they didn't see anything, they didn't know
28         anything, they didn't hear anything. And that's consistent with

> [S.F.'s] testimony because she had told you that she told no one until the day she got home on the 28th.
>
> The defendant is the only person in this case who has a motive to lie. He told you in his -- he told Detective Nelson himself someone in this situation has a reason to be deceptive and the fire bomb itself proves that he's guilty.

(*Id.* at 184.)

### b. State Court Decision

The Arizona Court of Appeals did not explicitly address this particular claim of prosecutorial misconduct.   Petitioner raised it in his Opening Brief.   (*See* Exhibit X, Opening Brief at 16.)

### c.  Application of Law

Petitioner misapprehends the nature of vouching.   Not every argument about the credibility of a witness, including their motives to lie or not lie, constitutes vouching. Rather, vouching occurs when the prosecutor's argument for credibility is "based upon matters outside the record," *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (prosecutor arguing professional repercussions if investigating agent lied, when no evidence in record to support), or asserts the prosecutor's own personal belief in the credibility of the witness, *id.* at 1147-1148.   With regard to the latter, the improper message is: "I believe [do not believe] the testimony of Witness A. Therefore you should believe [not believe] Witness A too [either]." *Id.* at 1148.

Here, Petitioner points to none of the factual assertions regarding motivation argued by the prosecutor that were not supported by the record.

Nor does Petitioner point to any language that asserted the personal belief of the prosecutor.   If Petitioner's argument were accepted, a prosecutor could never argue facts surrounding a witness's credibility (*e.g.* a witness's motives (or the lack thereof) to lie), at least in other than purely historical or abstract terms.   The prosecutor could never recount the evidence and argue that the facts were relevant to assessing credibility.   The undersigned has found no court limiting a prosecutor's closing arguments to a purely

25

historical recitation.

Accordingly, Petitioner has failed to show misconduct with regard to this portion of Ground 3.

**7.  Cumulative Effect of Alleged Incidents of Misconduct**

As discussed hereinabove, the undersigned has concluded that the prosecutor engaged in misconduct as asserted in Grounds 3A (delay in prosecution) and 3B (trial on March 19th), but not with respect to Ground 3C (vouching).

Although the impact of the individual instances of misconduct have been addressed, the courts must consider the cumulative effects of misconduct.  *Wood*, 693 F.3d at 1116.

Here, in the context of the entire trial, the undersigned finds no basis to conclude that Petitioner was denied a fair trial.

As recounted by the Arizona Court of Appeals,[2] there was substantial evidence against Petitioner demonstrating his complicity in the arson, and that the intent was an assault on the victim, S.F.. This included the phone calls between Petitioner and his friend Swan, the Petitioner's comments to his wife about a witness dropping dead, the post-arson conversations between Petitioner and Swan, and Deason's possession of a description of Swan and her address written on Petitioner's change of counsel form.

In retrospect, the comments regarding the 2006 investigation had little prominence in the proceeding.  The jury acquitted on the related sexual assault charges against the affected victim, C.C., and the other sexual assault charges with regard to the victim, S.F..  Although the prosecution argued that the arson and assault were proof of guilt on the assaults, thereby tying the sets of charges together, the jury could have

---

[2] Although Respondents have provided the trial transcripts, those transcripts do not include transcriptions of the recorded telephone calls introduced in evidence. Respondents have not otherwise provided transcripts of the calls, even though they constituted the bulk of the prosecution's case on the arson and assault charges. Nonetheless, because Petitioner proffers nothing to suggest that the Arizona Court of Appeals' characterization of the calls was an unreasonable one, the undersigned accepts it.

26

concluded that Petitioner was perfectly innocent of the sexual assault charges and still been wholly convinced of guilt on the arson and assault.  A wrongly accused defendant could be even more likely than a guilty one to want to do away with a complaining witness.

And, although the prosecution plainly misrepresented the evidence, the trial court repeatedly, forcefully, and pointedly instructed the jury that counsel's statements were not evidence.

Defense counsel was not constrained in rebutting the misrepresentations, and in fact did so repeatedly, and forcefully.

Based upon the foregoing, the undersigned cannot find a reasonable probability that the jury would have reached a different verdict without the offending comments.

Accordingly, Ground 3 is without merit and must be denied.


## B.  GROUND 2 - INSUFFICIENT INDICTMENT

In Ground Two, Petitioner alleges that the indictment was insufficient.  Petitioner makes no specific arguments as to any federal constitutional principles in this ground. Instead he cites a series of state statutes, rules and cases, the Federal Rules of Criminal Procedure, and various cases in federal criminal prosecutions.  (Petition, Doc. 1 at 7, 7a-7c).  At most, Petitioner makes a concluding remark that "[t]his is a clear violation of the Petitioner's U.S.C.A. V and XIV, as well as the correlative rights under the Az. Const."[3] (*Id.* at 7c.)

Respondents argue that Ground 2 is founded upon state law violations and thus not cognizable on habeas review. (Answer, Doc. 11 at 7-8.)

In his Reply, Petitioner argues that he was denied his Equal Protection rights by the denial of a grand jury indictment, and he was denied adequate notice by the absence of an adequate grand jury indictment and lack of a preliminary hearing.  (Reply, Doc. 12

---

[3] Although not addressed by the Arizona Court of Appeals, Petitioner argued that his Fifth, Sixth and Fourteenth Amendment Rights were violated by the "amendment" of Count 10 of the Indictment.  (Exhibit X, Pro Per Opening Brief at 21.)  .

1 | at 2.)

2 |     In evaluating a *pro se* prisoner's habeas petition, the habeas court cannot rest

3 | upon a strict construction of the Petitioner's language.  "We must construe *pro se* habeas

4 | filings liberally, and may treat the allegations of a verified complaint or petition as an

5 | affidavit." *Laws v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003).

6 |     **No Federal Right to Indictment** – The Fifth Amendment to the U.S.

7 | Constitution generally provides that in federal prosecutions, "[n]o person shall be held to

8 | answer for a capital, or otherwise infamous crime, unless on a presentment or indictment

9 | of a Grand Jury."  But this provision does not apply to state prosecutions.  "Indictment

10 | by grand jury is not part of the due process guarantees of the Fourteenth Amendment that

11 | apply to state criminal defendants." *Jeffries v. Blodgett*, 5 F.3d 1180, 1188 (9th Cir.

12 | 1993).  Thus, Petitioner could have properly been prosecuted with no indictment, or a

13 | wholly defective indictment.

14 |     Petitioner argues in his Reply, that the decision of the Arizona Court of Appeals

15 | was contrary to *Ex parte Bain*, 121 U.S. 1 (1887). Under the "contrary to" clause [of 28

16 | U.S.C. § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives

17 | at a conclusion opposite to that reached by this Court on a question of law or if the state

18 | court decides a case differently than this Court has *on a set of materially*

19 | *indistinguishable facts*." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Here, *Bain*

20 | dealt with a federal prosecution, which was subject to the Fifth Amendment grand jury

21 | right.  Because Petitioner's state prosecution was not subject to that right, *Bain* is

22 | materially distinguishable and the state court's decision could not be contrary to that

23 | decision.

24 |     **No Denial of Fair Notice of Charges** - On the other hand, "[t]he Sixth

25 | Amendment guarantees a criminal defendant a fundamental right to be clearly informed

26 | of the nature and cause of the charges in order to permit adequate preparation of a

27 | defense." *Sheppard v. Rees*, 909 F.2d 1234, 1236 (9th Cir. 1989).  "This guarantee is

28 | applicable to the states through the due process clause of the Fourteenth Amendment."

*Id.* at n.1 (citing *In re Oliver*, 333 U.S. 257, 273–74 (1948)).

> for purposes of AEDPA's "clearly established Federal law" requirement, it is "clearly established" that a criminal defendant has a right, guaranteed by the Sixth Amendment and applied against the states through the Fourteenth Amendment, to be informed of any charges against him, and that a charging document, such as an information, is the means by which such notice is provided. To satisfy this constitutional guarantee, the charging document need not contain a citation to the specific statute at issue; the substance of the information, however, must in some appreciable way apprise the defendant of the charges against him so that he may prepare a defense accordingly.

*Gautt v. Lewis*, 489 F.3d 993, 1004 (9th Cir. 2007).[4]

Although citing state law for the proposition, Petitioner argues that "[a]n indictment is insufficient as a matter of law when it fails to apprise the defendant of the crime charged, indefinite, or fails to protect him from further prosecution for the same offense." (Petition, Doc. 1 at 7.)  However, Petitioner fails to demonstrate that his ability to prepare a defense was denied because of inadequate notice of the nature and cause of the charges. At best, Petitioner complains that an "amendment" to Count 10 of the indictment rendered the indictment "ambiguous and indefinite." (Petition, Doc. 1 at 7.)

Count 10 charged that Petitioner "unlawfully used a wire communication or electronic communication, namely a telephone, to facilitate the violation of any felony provision." (Exhibit A at 5.)  In preparing final instructions to the jury, the prosecution argued for an instruction that referenced the use of the wire or electronic communication in a "crime." (Exhibit M, R.T. 6/14/10 at 88.)  Defense counsel objected, the trial court opined that the actual crime be substituted, and defense counsel agreed.  (*Id.* at 88-90.) The issue was again addressed, and the parties concluded to utilize the word "felonies" but to explicitly reference attempted murder and conspiracy to commit first degree murder.  (Exhibit N, R.T. 6/15/10 at 22-23.)  In charging the jury, the trial court

---

[4] It is unclear whether a violation of this portion of the Sixth Amendment is a structural error, or trial error subject to a harmless error analysis.  *See Smith v. Lopez*, 731 F.3d 859, 871 n. 5 (9th Cir. 2013) *cert. granted, judgment rev'd,* 135 S. Ct. 1, 190 L. Ed. 2d 1 (2014) (questioning prior holding of 9th Circuit based on intervening Supreme Court cases); and *Lopez v. Smith*, 135 S. Ct. 1 at n.2 (2014) (declining to address harmless error issue discussed below).

summarized Count 10 as "use of wire communication or electronic communication to facilitate a felony violation in this case (alleged attempted murder and alleged conspiracy to commit first degree murder)."  (*Id.* at 65.)   The Court finally instructed:

> The crime of use of wire communication or electronic communication requies [sic] proof that the defendant use any wire communication or electronic communication to fascilitate [sic] any of the following felonies:   Conspiracy to commit first degree murder, and attempted murder.

(*Id.* at 73.)

Thus, liberally construed, Petitioner's contention is that the indictment was deficient because it failed to identify the specific felonies being committed when the telephone was used, and that it was improperly amended by the jury instructions as the close of trial to add those allegations.

Petitioner fails to suggest, however, that he was ever confused about the nature of the felonies contemplated within Count 10.   "An indictment should be read in its entirety, construed according to common sense and interpreted to include facts which are necessarily implied."  *United States v. Christopher*, 700 F.2d 1253, 1257 (9th Cir. 1983) (federal prosecution).   The remaining counts of the indictment provided the context to provide Petitioner notice of the intended underlying offenses.   *See Echavarria-Olarte v. Reno,* 35 F.3d 395, 398 (9th Cir. 1994) (allegation of conspiracy to commit drug crime sufficient where specific drug crime was alleged in the remainder of the indictment).

Petitioner was acquitted on Count 10.  (This was not surprising given his acquittal on the two offenses that the trial court instructed were the underlying offenses, the two murder related charges.) However, Petitioner argues that because his use of the telephone was integral to the prosecution's case showing his participation in the arson and aggravated assault, for which he was convicted, he was harmed by any defects in Count 10.   However, as recognized by the Arizona Court of Appeals, "the elements of the offenses alleged in counts 7, 9, and 10 are different."   The notice given by the indictment on the arson and aggravated assault charges was not dependent upon the notice of the wire communications offense in Count 10, even if they all would eventually rely upon

the same evidence. "An indictment must provide the essential facts necessary to apprise a defendant of the crime charged; it need not specify the theories or evidence upon which the government will rely to prove those facts." *United States v. Cochrane,* 985 F.2d 1027, 1031 (9th Cir.1993). *Cf. U.S. v. Massey*, 827 F.2d 995, 1001 (5th Cir. 1987) (conviction for conspiracy to commit mail fraud not invalid even though the conviction on the separate mail fraud charge was unsupported by evidence of use of mails and therefore reversed, because other unlisted acts could provide necessary overt acts in furtherance of conspiracy).

Accordingly, any complaint that Petitioner's Sixth Amendment rights were violated by any original defect or subsequent amendment of Count 10 is without merit.

**Improper Amendment** – To a large extent, Petitioner simply complains that the "amendment" of Count 10 by the refining jury instruction denied his right to a grand jury indictment. As noted hereinabove, however, any right to a jury indictment arose under state law, and would not provide a basis for federal habeas relief.

Indeed, a state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in custody in violation of the Constitution, laws or treaties of the United States. Federal habeas relief is not available for alleged errors in the interpretation or application of state law. *Estelle v. McGuire*, 502 U.S. 62 (1991). "We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Further, it has long been understood that a state may violate its own law without violating the due process guarantees of the United States Constitution. *Gryger v. Burke*, 334 U.S. 728, 731 (1948).

> We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question.

*Id.*, 334 U.S. at 731.

**Due Process** - On the other hand, an error of state law may be "sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment." *Pully v. Harris*, 465 U.S. 37, 41 (1984).    To sustain such a due process claim founded on state law error, a habeas petitioner must show that the state court "error" was "so arbitrary and fundamentally unfair that it violated federal due process." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (quoting *Reiger v. Christensen*, 789 F.2d 1425, 1430 (9th Cir.1986)).   To receive review of what otherwise amounts to nothing more than an error of state law, a petitioner must argue "not that it is wrong, but that it is so wrong, so surprising, that the error violates principles of due process"; that a state court's decision was "such a gross abuse of discretion" that it was unconstitutional. *Brooks v. Zimmerman*, 712 F.Supp. 496, 498 (W.D.Pa.1989).

However, Petitioner makes no assertion that any such state law error was egregious.   At most, he asserts a simple error in determining whether the jury instructions amounted to an amendment, and whether that amendment was substantial enough to warrant reversal. *See e.g. State v. Bruce*, 125 Ariz. 421, 610 P.2d 65 (1980) (permitting amendments to conform to evidence unless amendment results in change to nature of offense charged or prejudice).

Moreover, by upholding Petitioner's convictions despite similar arguments, the Arizona Court of Appeals has effectively found that no improper amendment was effected, and this federal habeas court is bound by that state court's determination of state law.

**Equal Protection** - States are precluded under the Equal Protection Clause of the Fourteenth Amendment from denying equal protection of their laws to similarly situated persons. *Plyler v. Doe*, 457 U.S. 202, 216 (1982).  But, mere misapplication of the law or judicial error does not trigger equal protection concerns. The Fourteenth Amendment to the Constitution in guaranteeing equal protection of laws, does not assure uniformity of judicial decisions or immunity from judicial error *Beck v. Washington*, 369 U.S. 541,

554-555 (1962).  "Were it otherwise, every alleged misapplication of state law would constitute a federal constitutional question."  *Id*. at 554-55.

Ground 2 is without merit and must be denied.

## C.  GROUND 3 – JUDGE'S OATH

In Ground Three, Petitioner alleges that the judge lacked jurisdiction because he had not taken the oath of office at the proper times, resulting in the violation of his rights under the Fifth and Fourteenth Amendments.  (Petition, Doc. 1 at 8, 8a-8b.)

Respondents argue that this claim is a state law claim and thus not cognizable on federal habeas review.  (Answer, Doc. 11 at 7-8.)

Petitioner replies that his claim arises under Article 6, § 3 of the U.S. Constitution.  (Reply, Doc. 12 at 2-3.)

**Factual Background** – Petitioner argues that the trial judge was appointed to the bench by the Governor to serve a term beginning March 30, 1999 but he signed his Loyalty Oath of Office one week later, on April 7, 1999.  Petitioner appended a copy of the Notice of Appointment and Loyalty Oath of Office as Exhibit C to *Pro per* Opening Brief (Exhibit X).    Petitioner argued that the next oaths were not until 2007 and 2010.

Petitioner reasons that Ariz. Rev. Stat. § 38-232 (1999) required that the oath of office for an appointed officer must be "taken, subscribed and filed" "at least one day before commencement of the term of office," and that Ariz. Rev. Stat. § 38-291(9) (1984) deems an office vacant if the appointee fails "to file the person's official oath or bond within the time prescribed by law."[5]

**State Court Decision** – The Arizona Court of Appeals rejected Petitioner's arguments, taking judicial notice of the filed oaths of office from 1999, 2007 and 2010, and finding:

The record does not support the suggestion that Judge Gaines

---

[5] Petitioner relies upon other versions of these state statutes, which differ slightly.  The versions cited herein are those applicable at the time of the trial judge's original appointment.

> commenced his judicial duties before signing the Loyalty Oath of Office in 1999 -- only that he signed the oath one week after the Governor appointed him. Moreover, Judge Gaines' April 2007 oath authorized him to serve during a term of office that encompassed Williams' trial and sentencing.

(Exhibit Y, Mem. Dec. at 9.)  Moreover, the Court concluded that under the state's "*de facto* officer" doctrine, any defect in the judge's appointment was waived by not objecting prior to trial.  (*Id.* at 9-10.)

**Lack of Jurisdiction as Violation of Due Process** - Due Process (at least under the 14th Amendment) requires that a conviction be entered by a court with jurisdiction over the case.  As early as *Ex parte Royall*, 117 U.S. 241, 253 (1886), the Court noted approvingly a Georgia District Court case which had eschewed "the argument that where a defendant has been regularly indicted, tried, and convicted in a state court, his only remedy was to carry the judgment to the state court of last resort, and thence by writ of error to this court." Instead, the court had concluded:  'This might be so if the proceeding in the state court was merely erroneous; but where it is void for want of jurisdiction, *habeas corpus* will lie, and may be issued by any court or judge invested with supervisory jurisdiction in such case. *Id.* at 254, quoting *Ex parte Bridges*, 4 F.Cas. 98, 105 (D.C.Ga. 1875).

Similarly, in *Frank v. Mangum*, 237 U.S. 309 (1915), the Court discussed the limits on habeas review of state law claims and found that "we may not review irregularities or erroneous rulings upon the trial, however serious, and that the writ of habeas corpus will lie only in case the judgment under which the prisoner is detained is shown to be absolutely void for want of jurisdiction in the court that pronounced it, either because such jurisdiction was absent at the beginning, or because it was lost in the course of the proceedings."  237 U.S. at 327.

While a lack of jurisdiction may be grounds to find a violation of due process, a federal habeas court is not free to overturn a state court's finding that it had jurisdiction. In *Wright v. Angelone*, 151 F.3d 151 (4th Cir. 1998), the Fourth Circuit acknowledged that it was "axiomatic that we may grant the writ of habeas corpus upon the ground of

1   lack of jurisdiction in the sentencing court." 151 F.3d at 158.  The problem lie not with

2   finding that a lack of jurisdiction was a cognizable, federal due process claim, but with

3   the federal court attempting to overrule a state appellate court's determination that

4   jurisdiction in fact existed under applicable state law.  Thus, Wright's claim was rejected

5   because upon review of his challenge to the state court's jurisdiction, "the Virginia

6   Supreme Court, interpreting its own state laws and case law, concluded that it had 'no

7   merit.'"  *Id.*   "In fact, even if we were to conclude after an independent review that the

8   state court's holding was incorrect, we are nevertheless bound by it as a final

9   determination of state law by the highest court of the state." *Wright,* 151 F.3d at 158.

10      Here, the Arizona Court of Appeals has concluded that under Arizona law, the

11   trial judge had jurisdiction.  That ends the matter for this federal habeas court.

12      **Article 6 § 3 Requirement** – In his Reply, Petitioner now argues that not only

13   was the defect a violation of Arizona law, but of Article 6, § 3 of the U.S. Constitution.

14   That provision requires that "all executive and judicial Officers, both of the United States

15   and of the several States, shall be bound by Oath or Affirmation, to support this

16   Constitution."

17      "A Traverse is not the proper pleading to raise additional grounds for relief."

18   *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  For this reason alone, this

19   claim should be denied.

20      Moreover, Article 6 § 3 does not mandate a time for the taking of an oath, but

21   instead merely requires that one have been made.  Petitioner's allegations show that, at

22   the relevant time, *i.e.* at the time of Petitioner's trial, the trial judge had taken an oath to

23   "support the Constitution of the United States."  (Exhibit X, *Pro per* Opening Brief at

24   Exhibit C, 2007 Loyalty Oath of Office.)

25      Thus, no violation of this federal constitutional provision has been shown.

26      Accordingly, Ground 3 is without merit and must be denied.

27   //

28   //

**D. EXHAUSTION & PROCEDURAL DEFAULT: GROUND 4**

In Ground 4, Petitioner argues that his rights under the Fifth, Sixth, and Fourteenth Amendments were violated when the trial judge issued jury instructions defining the felony offenses underlying the wire communications charges in Count 10, and that doing so amounted to a comment on the evidence. Petitioner argues that the Arizona Court of Appeals failed to address this claim.  (Petition, Doc. 1 at 9.)    In directing a response to this Ground, the Court described the claim as simply asserting "that the judge ignored the law in charging the jury." (Order 10/8/14, Doc. 5 at 2 (emphasis added).)

Respondents argue that the facts were asserted in Petitioner's Opening Brief on direct appeal, but they were only asserted as a violation of state law.  Consequently, Respondents argue that Petitioner failed to fairly present his federal claim, thus did not properly exhaust his state remedies, and has now procedurally defaulted on them.

Petitioner replies that he had only Arizona law at his disposal, could not have anticipated the state's failure to enforce its own law, and failure to address this claim will lead to a "fundamental miscarriage of justice" because he was not afforded equal protection under the Fourteenth Amendment.  (Reply, Doc. 12 at 4 (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).)

**1. Exhaustion Requirement**

Generally, a federal court has authority to review a state prisoner's claims only if available state remedies have been exhausted. *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (*per curiam*). The exhaustion doctrine, first developed in case law, has been codified at 28 U.S.C. § 2254(b) and (c).  When seeking habeas relief, the burden is on the petitioner to show that he has properly exhausted each claim. *Cartwright v. Cupp*, 650 F.2d 1103, 1104 (9th Cir. 1981)(*per curiam*), *cert. denied*, 455 U.S. 1023 (1982).

"A petitioner fairly and fully presents a claim to the state court for purposes of satisfying the exhaustion requirement if he presents the claim: (1) to the proper forum,

(2) through the proper vehicle, and (3) by providing the proper factual and legal basis for the claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005).

**Proper Forum** - "In cases not carrying a life sentence or the death penalty, 'claims of Arizona state prisoners are exhausted for purposes of federal habeas once the Arizona Court of Appeals has ruled on them.'" *Castillo v. McFadden*, 399 F.3d 993, 998 (9th Cir. 2005)(quoting *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999)).

**Proper Vehicle** - Ordinarily, "to exhaust one's state court remedies in Arizona, a petitioner must first raise the claim in a direct appeal or collaterally attack his conviction in a petition for post-conviction relief pursuant to Rule 32." *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). Only one of these avenues of relief must be exhausted before bringing a habeas petition in federal court. This is true even where alternative avenues of reviewing constitutional issues are still available in state court. *Brown v. Easter*, 68 F.3d 1209, 1211 (9th Cir. 1995); *Turner v. Compoy*, 827 F.2d 526, 528 (9th Cir. 1987), *cert. denied*, 489 U.S. 1059 (1989).

**Factual Basis** – A petition must have fairly presented the operative facts of his federal claim to the state courts as part of the same claim. A petitioner may not broaden the scope of a constitutional claim in the federal courts by asserting additional operative facts that have not yet been fairly presented to the state courts. Expanded claims not presented in the highest state court are not considered in a federal habeas petition. *Brown v. Easter*, 68 F.3d 1209 (9th Cir. 1995); *see also, Pappageorge v. Sumner*, 688 F.2d 1294 (9th Cir. 1982), cert. denied, 459 U.S. 1219 (1983). And, while new factual allegations do not ordinarily render a claim unexhausted, a petitioner may not "fundamentally alter the legal claim already considered by the state courts." *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986). *See also Chacon v. Wood*, 36 F.3d 1459, 1468 (9th Cir.1994).

**Legal Basis** - Failure to so alert the state court to the constitutional nature of the claim will amount to failure to exhaust state remedies. *Duncan v. Henry*, 513 U.S. 364, 366 (1995). While the petitioner need not recite "book and verse on the federal

constitution," *Picard v. Connor,* 404 U.S. 270, 277-78 (1971) (quoting *Daugherty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958)), it is not enough that all the facts necessary to support the federal claim were before the state courts or that a "somewhat similar state law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*). "[T]he petitioner must make the federal basis of the claim explicit either by specifying particular provisions of the federal Constitution or statutes, or by citing to federal case law," *Insyxiengmay v. Morgan*, 403 F.3d 657, 668 (9th Cir. 2005), or by "a citation to a state case analyzing [the] federal constitutional issue." *Peterson v. Lampert*, 319 F.3d 1153, 1158 (9th Cir. 2003). But a drive-by-citation of a state case applying federal and state law is not sufficient.

> For a federal issue to be presented by the citation of a state decision dealing with both state and federal issues relevant to the claim, the citation must be accompanied by some clear indication that the case involves federal issues. Where, as here, the citation to the state case has no signal in the text of the brief that the petitioner raises federal claims or relies on state law cases that resolve federal issues, the federal claim is not fairly presented.

*Casey v. Moore*, 386 F.3d 896, 912 n. 13 (9th Cir. 2004).

**Fair Presentation** - "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). The Arizona habeas petitioner "must have presented his federal, constitutional issue before the Arizona Court of Appeals within the four corners of his appellate briefing." *Castillo v. McFadden*, 399 F.3d 993, 1000 (9th Cir. 2005). *But see Insyxiengmay v. Morgan*, 403 F.3d 657, 668-669 (9th Cir. 2005) (arguments set out in appendix attached to petition and incorporated by reference were fairly presented).

**2. Procedural Default**

Ordinarily, unexhausted claims are dismissed without prejudice. *Johnson v. Lewis*, 929 F.2d 460, 463 (9th Cir. 1991). However, where a petitioner has failed to

properly exhaust his available administrative or judicial remedies, and those remedies are now no longer available because of some procedural bar, the petitioner has "procedurally defaulted" and is generally barred from seeking habeas relief.  Dismissal with prejudice of a procedurally defaulted habeas claim is generally proper absent a "miscarriage of justice" which would excuse the default.  *Reed v. Ross*, 468 U.S. 1, 11 (1984).

Respondents argue that Petitioner may no longer present his unexhausted claims to the state courts.  Respondents rely upon Arizona's preclusion bar, set out in Ariz. R. Crim. Proc. 32.2(a) and time limit bar, set out in Ariz. R. Crim. P.  32.4.  (Answer, Doc. 11 at 12.)

**Remedies by Direct Appeal** - Under Ariz.R.Crim.P. 31.3, the time for filing a direct appeal expires twenty days after entry of the judgment and sentence. Moreover, no provision is made for a successive direct appeal.  Accordingly, direct appeal is no longer available for review of Petitioner's unexhausted claims.

**Remedies by Post-Conviction Relief** – Under Arizona's preclusion, waiver and timeliness bars, Petitioner can no longer seek review by a subsequent PCR Petition.

Preclusion Bar – Under the rules applicable to Arizona's post-conviction process, a claim may not be brought in a petition for post-conviction relief if the claim was "[f]inally adjudicated on the merits on appeal or in any previous collateral proceeding." Ariz. R. Crim. P. 32.2(a)(2).

Waiver Bar - Under the rules applicable to Arizona's post-conviction process, a claim may not ordinarily be brought in a petition for post-conviction relief that "has been waived at trial, on appeal, or in any previous collateral proceeding."   Ariz.R.Crim.P. 32.2(a)(3).   Under this rule, some claims may be deemed waived if the State simply shows "that the defendant did not raise the error at trial, on appeal, or in a previous collateral proceeding." *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (quoting Ariz.R.Crim.P. 32.2, Comments). *But see State v.* Diaz, 236 Ariz. 361, 340 P.3d 1069 (2014) (failure of PCR counsel, without fault by petitioner, to file timely petition in prior PCR proceedings did not amount to waiver of claims of ineffective assistance of

1  trial counsel).

2      For others of "sufficient constitutional magnitude," the State "must show that the

3  defendant personally, "knowingly, voluntarily and intelligently' [did] not raise' the

4  ground or denial of a right." *Id*.  That requirement is limited to those constitutional

5  rights "that can only be waived by a defendant personally." *State v. Swoopes*, 216 Ariz.

6  390, 399, 166 P.3d 945, 954 (App.Div. 2, 2007).  Indeed, in coming to its prescription in

7  *Stewart v. Smith*, the Arizona Supreme Court identified: (1) waiver of the right to

8  counsel, (2) waiver of the right to a jury trial, and (3) waiver of the right to a twelve-

9  person jury under the Arizona Constitution, as among those rights which require a

10  personal waiver.  202 Ariz. at 450, 46 P.3d at 1071.   Claims based upon ineffective

11  assistance of counsel are determined by looking at "the nature of the right allegedly

12  affected by counsel's ineffective performance. *Id*.

13      Here, Petitioner's claims in Ground 4 are not of the sort requiring a personal

14  waiver.

15      Timeliness Bar - Even if not barred by preclusion, Petitioner would now be barred

16  from raising his claims by Arizona's time bars.  Ariz.R.Crim.P. 32.4 requires that

17  petitions for post-conviction relief (other than those which are "of-right") be filed

18  "within ninety days after the entry of judgment and sentence or within thirty days after

19  the issuance of the order and mandate in the direct appeal, whichever is the later." *See*

20  *State v. Pruett*, 185 Ariz. 128, 912 P.2d 1357 (App. 1995) (applying 32.4 to successive

21  petition, and noting that first petition of pleading defendant deemed direct appeal for

22  purposes of the rule).   That time has long since passed.

23      Exceptions - Rules 32.2 and  32.4(a) do not bar dilatory claims if they fall within

24  the category of claims specified in Ariz.R.Crim.P. 32.1(d) through (h). See Ariz. R.

25  Crim. P.  32.2(b) (exceptions to preclusion bar); Ariz. R. Crim. P.  32.4(a) (exceptions to

26  timeliness bar).  Petitioner has not asserted that any of these exceptions are applicable to

27  his claims.   Nor does it appears that such exceptions would apply.  The rule defines the

28  excepted claims as follows:

40

1
2
3
4
5
6
7
8
9
10
11
12
13

> d. The person is being held in custody after the sentence imposed has expired;
> e. Newly discovered material facts probably exist and such facts probably would have changed the verdict or sentence. Newly discovered material facts exist if:
>> (1) The newly discovered material facts were discovered after the trial.
>> (2) The defendant exercised due diligence in securing the newly discovered material facts.
>> (3) The newly discovered material facts are not merely cumulative or used solely for impeachment, unless the impeachment evidence substantially undermines testimony which was of critical significance at trial such that the evidence probably would have changed the verdict or sentence.
> f. The defendant's failure to file a notice of post-conviction relief of-right or notice of appeal within the prescribed time was without fault on the defendant's part; or
> g. There has been a significant change in the law that if determined to apply to defendant's case would probably overturn the defendant's conviction or sentence; or
> h. The defendant demonstrates by clear and convincing evidence that the facts underlying the claim would be sufficient to establish that no reasonable fact-finder would have found defendant guilty of the underlying offense beyond a reasonable doubt, or that the court would not have imposed the death penalty.

14   Ariz.R.Crim.P. 32.1.

15   Paragraph 32.1 (d) (expired sentence) generally has no application to an Arizona

16   prisoner who is simply attacking the validity of his conviction or sentence.  Where a

17   claim is based on "newly discovered evidence" that has previously been presented to the

18   state courts, the evidence is no longer "newly discovered" and paragraph (e) has no

19   application.  Here, Petitioner has long ago asserted the facts underlying his claims.

20   Although Petitioner's direct appeal was delayed, he was allowed to file it and thus

21   Paragraph (f) has no application.  Paragraph (g) has no application because Petitioner has

22   not asserted a change in the law since his last PCR proceeding.  Finally, paragraph (h),

23   concerning claims of actual innocence, has no application to the procedural claims

24   Petitioner asserts in this proceeding.

25   Therefore, none of the exceptions apply, and Arizona's time and waiver bars

26   would prevent Petitioner from returning to state court.  Thus, Petitioner's claims that

27   were not fairly presented are all now procedurally defaulted.

28

**4. Application to Ground 4**

In the fourth assignment of error in his *Pro per* Opening Brief, Petitioner argued "Did the judge err in charging the jury with respect to matters of fact or commenting thereon as opposed to declaring the law." (Exhibit X at 3.) In arguing this error, Petitioner relied upon Article 6 § 27 and Article 2 § 32 of the Arizona Constitution. (*Id.* at 35-36.) Petitioner made no reference to any federal law or cases (federal or state).

Assertion of the facts of a claim, without making the federal violation clear, is not fair presentation of a claim, and does not result in proper exhaustion. *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(*per curiam*).

Moreover, for the reasons discussed hereinabove, Petitioner has now procedurally defaulted on his state remedies.

**5. Cause and Prejudice**

If the habeas petitioner has procedurally defaulted on a claim, he may not obtain federal habeas review of that claim absent a showing of "cause and prejudice" sufficient to excuse the default. *Reed v. Ross*, 468 U.S. 1, 11 (1984).

"Cause" is the legitimate excuse for the default. *Thomas v. Lewis*, 945 F.2d 1119, 1123 (1991). "Because of the wide variety of contexts in which a procedural default can occur, the Supreme Court 'has not given the term "cause" precise content.'" *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990) (quoting Reed, 468 U.S. at 13), *cert. denied*, 498 U.S. 832 (1990). The Supreme Court has suggested, however, that cause should ordinarily turn on some objective factor external to petitioner, for instance:

> ... a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that "some interference by officials", made compliance impracticable, would constitute cause under this standard.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986) (citations omitted).

Petitioner argues that this Court should find cause to excuse his procedural defaults based on: (1) his limited access to legal materials; and (2) his surprise at the

state court's failure to enforce state law.  He also asserts that failure to address the claim will result in a miscarriage of justice.

**<u>Lack of Legal Resources</u>** - A *pro se* petitioner may be able to establish cause if he can establish a lack of access to the law, as opposed to a lack of knowledge of the law.  *See e.g. Dulin v. Cook*, 957 F.2d 758 (10th Cir. 1992) (remanding for a determination of cause where a pro se petitioner's incarceration in Nevada precluded access to Utah legal materials required to challenge a Utah conviction).  The petitioner must establish, however, that the lack of access resulted in an inability to assert his claims.  *See e.g. Thomas v. Lewis*, 945 F.2d 1119 (9th Cir. 1991) (finding no "cause" where despite lack of resources generally, pro se prisoner had not shown personal deprivation, and had managed to file other adequate petitions.)

Here, Petitioner proffers nothing to show that he did not have access to specific legal resources necessary to identify his federal claims at the time, but to which he has since gained access.

Moreover, at the relevant time period, *e.g.* during his direct appeal when this claim should have been raised as a federal claim, Petitioner was represented by counsel, and thus not dependent upon the prison law library.

To the extent that Petitioner might argue that his appellate counsel was ineffective in failing to raise this claim (rather than filing an *Anders* brief), "[t]o constitute cause for procedural default of a federal habeas claim, the constitutional claim of ineffective assistance of counsel must first have been presented to the state courts as an independent claim." *Cockett v. Ray*, 333 F.3d 938, 943 (9th Cir. 2003).  Petitioner has not presented such a claim to the Arizona courts.

**<u>Surprise</u>** – Petitioner argues he was unable to anticipate his lack of success on his state law claim.  The "cause and prejudice" standard is equally applicable to pro se litigants. *Harmon v. Barton*, 894 F.2d 1268, 1274 (11th Cir. 1990); *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 908 (9th Cir. 1986).  Thus, any tactical or legal error by Petitioner would not establish cause.

Moreover, the exhaustion requirement does not permit a litigant to first exhaust his remedies on state law claims, and then if unsuccessful to pursue his federal claims. While a state might permit such a process, Arizona makes no provision for such bifurcated proceedings.   To the contrary, Arizona Rule of Criminal Procedure 32.2(a) (Preclusion) embodies the expectation that a defendant will bring all claims (without distinction between state or federal) on direct appeal (or an original PCR proceeding for those claims not raisable on direct appeal, *e.g.* ineffective assistance of trial counsel, unless excepted under Rule 32.2(b).).

**Summary re Cause and Prejudice** – Based upon the foregoing, the undersigned concludes that Petitioner had failed to establish cause to excuse his procedural defaults.

Both "cause" and "prejudice" must be shown to excuse a procedural default, although a court need not examine the existence of prejudice if the petitioner fails to establish cause. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982); *Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).   Petitioner has filed to establish cause for his procedural default.   Accordingly, this Court need not examine the merits of Petitioner's claims or the purported "prejudice" to find an absence of cause and prejudice.

# E.  ACTUAL INNOCENCE AS CAUSE

Petitioner argues that failure to consider his claim will result in a miscarriage of justice.

The standard for "cause and prejudice" is one of discretion intended to be flexible and yielding to exceptional circumstances, to avoid a "miscarriage of justice." *Hughes v. Idaho State Board of Corrections*, 800 F.2d 905, 909 (9th Cir. 1986).   Accordingly, failure to establish cause may be excused "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986) (emphasis added).   Although not explicitly limited to actual innocence claims, the Supreme Court has not yet recognized a "miscarriage of justice" exception to exhaustion outside of actual

innocence.  *See* Hertz & Lieberman, *Federal Habeas Corpus Pract. & Proc.* §26.4 at 1229, n. 6 (4th ed. 2002 Cumm. Supp.).  The Ninth Circuit has expressly limited it to claims of actual innocence.  *Johnson v. Knowles*, 541 F.3d 933, 937 (9th Cir. 2008).

Petitioner makes no argument that he is actually innocent, but simply argues various errors and constitutional violations at trial.  Accordingly his procedurally defaulted and procedurally barred claims must be dismissed with prejudice.

## IV.  CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment.  The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner.  Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right

1   and that jurists of reason would find it debatable whether the district court was correct in

2   its procedural ruling." *Id.*

3       **Standard Not Met** - Assuming the recommendations herein are followed in the

4   district court's judgment, that decision will be on in part on the merits and in part on

5   procedural grounds. Under the reasoning set forth herein, the constitutional claims

6   addressed on their merits are plainly without merit. With regard to the claims addressed

7   on procedural grounds, jurists of reason would not find it debatable whether the district

8   court was correct in its procedural ruling.

9       Accordingly, to the extent that the Court adopts this Report & Recommendation

10  as to the Petition, a certificate of appealability should be denied.

11

12  ## V. RECOMMENDATION

13      **IT IS THEREFORE RECOMMENDED** that Ground 4 of the Petitioner's

14  Petition for Writ of Habeas Corpus, filed June 24, 2014 (Doc. 1) be **DISMISSED**

15  **WITH PREJUDICE**.

16      **IT IS FURTHER RECOMMENDED** that the remainder of Petitioner's Petition

17  for Writ of Habeas Corpus, filed June 24, 2014 (Doc. 1) be **DENIED**, and this action

18  **DISMISSED WITH PREJUDICE**.

19      **IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings

20  and recommendations are adopted in the District Court's order, a Certificate of

21  Appealability be **DENIED**.

22

23  ## VI. EFFECT OF RECOMMENDATION

24      This recommendation is not an order that is immediately appealable to the Ninth

25  Circuit Court of Appeals. Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules*

26  *of Appellate Procedure*, should not be filed until entry of the district court's judgment.

27      However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties

28  shall have fourteen (14) days from the date of service of a copy of this recommendation

within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings.   Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: August 18, 2015

14-1417r RR 15 04 17 on HC.docx

James F. Metcalf
United States Magistrate Judge